UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KENNETH E. SHAW and DAWN M.
SHAW,

     Plaintiffs,

v.                                                                    Case No:   6:15-cv-686-Orl-TBS

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

     Defendant.

_____

## ORDER[1]

This case comes before the Court on Defendant Liberty Mutual Fire Insurance

Company's Motion for Summary Judgment on the Pollution Exclusion (Doc. 46).

Plaintiffs Kenneth E. Shaw and Dawn M. Shaw have filed a response in opposition to the

motion (Doc. 50), and Liberty Mutual has filed a reply (Doc. 51).   For the reasons that

follow, the motion is due to be granted.

## I. Background

While on vacation, the Shaws spent the night in a rented room at the Boardwalk

Inn and Suites (the "Hotel") located at 301 South Atlantic Avenue, Daytona Beach, Florida

(Doc. 46-1, ¶¶ 19-29; Doc. 46-2, ¶¶ 19-29; Doc. 50 at 5).   Their room was on the first

floor directly above an enclosed parking garage (Doc. 50-2, at 1-2).   During the night, the

Shaws were poisoned by carbon monoxide gas (Doc. 50 at 2).   An expert retained by

their counsel believes the accident occurred because brick grates originally designed to

_____

[1] The parties consented to have the case referred to a magistrate judge and on May 26, 2015, the district judge entered an Order referring the case to the magistrate judge to conduct all proceedings and enter final judgment in accordance with 28 U.S.C. § 636(c) and FED. R. CIV. P. 73 (Doc. 27).

permit airflow into the parking garage for ventilation purposes had been blocked (Doc. 50-2 at 2).   The expert opines that because the grates were blocked, there was negligible, if any airflow in the garage underneath the Shaws' room (Id., at 3).   This allowed carbon monoxide to concentrate and enter the room through openings where plumbing lines penetrate the ceiling of the garage (Id., at 2).   An expert engaged by counsel for the owners of the Hotel believes two gas pool heaters improperly installed in the "poorly vented" parking garage were the source of the carbon monoxide gas (Doc. 51-2 at 2).

The Shaws filed separate but substantially identical state court lawsuits against the owners, operators, and managers of the Hotel (Docs. 46-1, 46-2).   They alleged that as the result of those defendants' negligence, they were "exposed to an environmental contaminant on the hotel premises, determined by treating doctors to be carbon monoxide, an unsafe condition, causing Plaintiff to sustain severe and violent injuries." (Doc. 46-1, ¶ 22; Doc. 46-2, ¶ 22).   Both complaints sought damages for breach of the duty to maintain the Hotel premises in a reasonably safe condition; failure to make reasonable inspections to determine whether any unsafe conditions existed; failure to warn the public of known unsafe conditions; and failure to take actions commonly taken by persons owning and operating hotels to detect carbon monoxide (Id.).

The state court complaints alleged that when the accident occurred, the Hotel was owned and/or operated by GS 2006-GG6 Boardwalk Inn, LLC, Prism Hotel Management Company, Inc., Prism Hotel Company, Prism Hotel Partners GP, Inc., Prism Hotel Partners, L.P., and Prism Hospitality LP (Id., ¶¶ 2-13).   With the exception of Prism Hospitality LP, all of these entities were insured by Federal Insurance Company under a primary general commercial liability policy with applicable policy limits of $1,000,000

(Doc. 50-4, ¶ 3).   Federal undertook the defense of the state court lawsuits (Doc. 50-4, ¶ 6).

When the accident occurred, Prism Hotel Management Company, Inc., Prism Hotel Partners, L.P., and Prism Hotel Partners G.P., Inc. (collectively "Prism"), were insured by Liberty Mutual under a commercial liability umbrella policy ("Policy") with limits of $25,000,000 (Doc. 30, ¶ 5).   Liberty Mutual denied coverage based upon the pollution exclusion in the Policy (Doc. 46 at 4).

The parties to the state court lawsuits, together with Federal, negotiated and settled on terms contained in a written agreement.   The settlement agreement provides for a neutral arbitrator to determine the amount of the Shaws' damages (Doc. 50-4, ¶ 2). After considering the parties' presentations the arbitrator found that Dawn M. Shaw suffered damages in the amount of $6,798,323.62, and Kenneth E. Shaw suffered damages in the amount of $577,634.43 (Id., at 24).   Federal paid its $1,000,000 policy limits to the Shaws in return for a full release of all claims (Id., ¶¶ 4-10).   The state court defendants assigned all of their claims against Liberty Mutual to the Shaws in return for a covenant that, so long as they cooperate with the Shaws, the Shaws will not attempt to collect from them (Id., ¶ 5).

After settling their personal injury claims, the Shaws filed this declaratory judgment action in the state court, seeking to establish coverage under the Policy (Doc. 2).   Liberty Mutual removed the case to this Court based upon diversity jurisdiction (Doc. 1).   The Shaws' amended complaint prays for a declaration that their injuries are covered losses under the Policy, and Liberty Mutual should be required to pay the amounts still owed to them under the settlement agreement (Doc. 30 at 4).   Pending before the Court is Liberty

Mutual's motion for a summary judgment that there is no coverage, and therefore, it has no liability, based upon the pollution exclusion in the Policy (Doc. 46 at 4).

## II. Summary Judgment Standard

A party is entitled to summary judgment if it can show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.   FED. R. CIV. P. 56.   An issue of fact is "genuine" if the evidence is such that a reasonable jury could find the fact in favor of the nonmoving party and "material" if the fact "might affect the outcome of the suit under the governing law."   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ave. CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287, 1294 (11th Cir. 2013).

On a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.   Ave. CLO Fund, 723 F.3d at 1294 (citing Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480, 1482 (11th Cir. 1985)).   The party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists.   Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); Watson v. Adecco Emp't Servs., Inc., 252 F.Supp.2d 1347, 1351-52 (M.D. Fla. 2003).   The movant can meet this burden directly by negating an essential element of the nonmoving party's claim, or by showing that there is insufficient evidence in the materials on file for the nonmoving party to establish its burden of proof at trial.   Clark, 929 F.2d at 608.

When the moving party demonstrates an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must then "go beyond the pleadings and by [its] own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial."   Celotex Corp., 477 U.S. at 324-35

(internal quotations and citations omitted); Clark, 929 F.2d at 608.

"Essentially, the inquiry is whether the evidence presents a sufficient disagreement

to require submission to the jury or whether it is so one-sided that one party must prevail

as a matter of law."   Sawyer v. S.W. Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan.

2003) (quoting Anderson, 477 U.S. at 251-52); see also LaRoche v. Denny's, Inc., 62 F.

Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception,

opinion, and belief cannot be used to defeat a motion for summary judgment.").   The

Court "must avoid weighing conflicting evidence or making credibility determinations,"

Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000), since it is the

province of the jury and not the judge to assess the probative value of the evidence.

Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980).

### III. Choice of Law

Because the Court's jurisdiction is based on diversity of citizenship, it must

examine the law of the forum state, including its choice of law rules, to determine what

law applies to this controversy.[2]   Pastor v. Union Ctr. Life Ins. Co., 184 F. Supp. 2d 1301,

1304 (S.D. Fla. 2002) *aff'd* 128 F. App'x. 100 (11th Cir. 2005).   In cases involving

contracts, Florida follows the rule of *lex loci contractus* which, "as applied to insurance

contracts, provides that the law of the jurisdiction where the contract was executed

governs the rights and liabilities of the parties in determining an issue of insurance

coverage."   State Farm Mut. Auto. Ins. Co. v. Roach, 945 So. 2d 1160, 1163 (Fla. 2006);

---

[2] Liberty Mutual argues that the result on the merits is the same regardless of whether the Court
applies Texas or Florida law (Doc. 46 at 2).

LaTorre v. Conn. Mut. Life Ins. Co., 38 F.3d 538, 540 (11th Cir. 1994) ("Florida law adheres to the traditional rule that the legal effects of terms of the insurance policy and rights and obligations of persons insured thereunder are to be determined by the law of the state where the policy was issued."). The Policy was executed in Texas, and Prism is a Texas business entity (Doc. 1, ¶¶ 7-10; Doc. 51 at 2). Therefore, unless an exception applies, the Court should apply Texas law.

Florida recognizes a public policy exception to the rule of *lex loci contractus*. In the case of an insurance contract, before the exception will apply, the following requirements must be met: (1) a Florida citizen is in need of protection; (2) the case is a matter of paramount Florida public policy; and (3) the insurer must be on reasonable notice that the insured is a Florida citizen. Roach, at 1165. The exception does not apply because Prism is not a citizen of Florida. Additionally, although the Shaws argue that this is a case of first impression in Florida, they have not shown that it implicates a paramount Florida public policy.

## IV. Texas Law

"Under Texas law, insurance policies are construed under the usual principles of contract law. The court's primary role is to give effect to the written expression of the parties' intent. In defining the scope of coverage, the court examines the entire policy to determine the true intent of the parties. The court must read the policy as a whole and give effect to each of its contractual provisions so that none is rendered meaningless. The terms of a contract are given their plain, ordinary, generally accepted meaning unless the contract itself redefines those terms or indicates that the parties used the terms in a technical or different sense. When a contract is clear and unambiguous, i.e., when it can be given a definite or certain legal meaning, the court enforces it as written. Where the

contract's language can be given two or more reasonable interpretations, it is ambiguous. In an insurance policy, if a provision, especially an exclusionary clause, is ambiguous, the court must resolve the ambiguity in favor of the insured."  United Neurology, P.A. v. Hartford Lloyd's Ins. Co., 101 F. Supp. 3d 584, 591 (S.D. Tex. 2015) (internal citations omitted).  "'The parties' disagreement regarding the extent of coverage does not create an ambiguity.'"  Indem. Ins. Co. of North America v. W & T Offshore, Inc., 756 F.3d 347, 352 (5th Cir. 2014) (quoting Travelers Lloyds Ins. Co. v. Pac Emp'rs Ins. Co., 602 F.3d 677, 681 (5th Cir. 2010)).  "'Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered [into].'"  Noble Energy, Inc. v. Bituminous Cas. Co., 529 F.3d 642, 646 (5th Cir. 2008) (quoting Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W. 2d 517, 520 (Tex. 1995)).

## V. Analysis

In the Policy Liberty Mutual promised to "pay those sums in excess of the retained limit that the insured becomes legally obligated to pay as damages because of … bodily injury … [or] … property damage … to which this policy applies."  (Doc. 46-3 at 11). Endorsement LG 3055 TH R1 (4/97) excludes coverage for:

> Bodily injury, personal injury or property damage arising out of
> the actual, alleged or threatened discharge, dispersal,
> seepage, migration, release or escape of pollutants …
> Pollutants means any solid, liquid, gaseous or thermal irritant
> or contaminant, including smoke, vapor, soot, fumes, acids,
> alkalis, chemicals, and waste.   Waste includes materials to
> be recycled, reconditioned, or reclaimed.

(Doc. 46-3 at 14).   Texas law puts the burden on Liberty Mutual to prove that this exclusion applies.   Nautilus Ins. Co. v. Cntry. Oaks Apartments, Ltd., 566 F.3d 452, 454 (5th Cir. 2009).

The Shaws argue that the pollution exclusion is ambiguous and not factually applicable to their claims.   They provide an interesting discussion of the history of pollution exclusions in insurance policies, and cite decisions from jurisdictions other than Texas that have distinguished between pollutants as traditional contaminants, and general irritants that are not deemed to be pollutants within the terms of insurance policies (Doc. 50 at 4-4).   But the Shaws have failed to cite any Texas case that has made this distinction, and contrary to their arguments, courts applying Texas law have consistently found that pollution exclusions using substantially the same language as that in the Policy are clear and unambiguous.   Nat'l Union Fire, 907 S.W.2d at 519-22; Zaiontz v. Trinity Univ. Ins. Co., 87 S.W.3d 565, 571 (Tex. App.-San Antonio 2002); Nautilus, 566 F.3d at 454-55 (5th Cir. 2009); Columbia Cas. Co. v. Georgia & Florida Railnet, Inc., 542 F.3d 106, 112-13 (5th Cir. 2008); Noble, 529 F.3d at 646-47; United Nat. Ins. Co. v. Hydro Tank, Inc., 525 F.3d 400, 402 (5th Cir. 2008); Certain Underwriters at Lloyd's London v. C.A. Turner Const. Co., Inc., 112 F.3d 184, 187-88 (5th Cir. 1997); SnyderGeneral Corp. v. Great American Ins. Co., 928 F. Supp. 674, 679 (N.D. Tex. 1996).   Based on its own reading of the Policy and this case law, the Court finds that the pollution exclusion in the Policy is unambiguous and not subject to more than one reasonable interpretation.   The exclusion encompasses any pollutant (as defined in the Policy), that is discharged, dispersed, seeps, migrates, is released, or escapes.

The next question is whether carbon monoxide is a "pollutant" as defined in the Policy.   In their state court complaints the Shaws alleged that the carbon monoxide they inhaled was "an environmental contaminant" which caused them "serious and permanent physical injuries."   (Doc. 46-1 at ¶¶ 22, 25; Doc. 46-2 at ¶¶ 22, 25).   Their averments are consistent with their expert witness' description of carbon monoxide as a "toxic gas" (Doc.

50-2 at 2).   The federal government classifies carbon monoxide as a pollutant and regulates its concentration under the Clean Air Act, 40 C.F.R. § 50.8 (2012).   Courts applying Texas law hold that carbon monoxide is a pollutant, and courts in other states have reached the same result.[3]   Nautilus, 566 F.3d at 455-56; Century Sur. Co. v. Casino West, Inc., 329 P.3d 614, 617 (Nev. 2014); Midwest Family Mut. Ins. Co. v. Wolters, 831 N.W.2d 628, 637 (Minn. 2013).   The Court finds that while carbon monoxide is a naturally occurring gas that is present in the air we breathe, it is also an irritant, contaminant, and toxic at the level of concentration experienced by the Shaws. Therefore, carbon monoxide clearly and unambiguously fits within the definition of a "pollutant" under the Policy.

This brings the Court to the question of whether the carbon monoxide gas that poisoned the Shaws was discharged, dispersed, seeped, migrated, was released or escaped.   Because these terms are not defined in the Policy the Court considers their plain, ordinary meanings.   The Merriam Webster Dictionary defines "seep" to mean "to flow or pass slowly through small openings in something."[4]   The dictionary defines "migrate" as "to move from one country, place, or locality to another."[5]   "Escape" means "to get away."[6]   The only way for the carbon monoxide gas in the Shaws' Hotel room to reach the level it did is if a large amount made its way there from some other location. For purposes of this motion, the Court assumes the Shaws' expert witness is correct, that the carbon monoxide gas they inhaled travelled from the parking garage through

---

[3] The Court acknowledges decisions from courts in other states holding that carbon monoxide was not a pollutant under a pollution exclusion.   See Thompson v. Temple, 580 So.2d 1133, 1135 (La. Ct. App. 1991).

[4] See www.merriam-webster.com/dictionery/seep.

[5] See www.merriam-webster.com/dictionary/migrate.

[6] See www.merriam-webster.com/dictionary/escape.

openings created for the plumbing system.   This is sufficient to establish that the gas was discharged, dispersed, seeped, migrated, was released or escaped as required for the pollution exclusion to apply.

The Shaws argue that their injuries were not caused by a "pollutant," but by the Hotel's owners and operators' failure to properly maintain the ventilation and plumbing systems, and failure to deploy adequate detection devices.   They maintain that none of these systems is a pollutant, and therefore, the Policy provides coverage for their claims. While the systems themselves, and the lack of detection equipment are not pollutants, this accident would not have happened if carbon monoxide gas had not accumulated in the parking garage, and then migrated into the Shaws' room.   It was the combination of these factors that resulted in the Shaws being injured.

The Policy excludes coverage for bodily or personal injury "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants …" (Doc. 46-3 at 14).   Under Texas law, "[t]he words 'arising out of,' when used within an insurance policy, are 'broad, general, and comprehensive terms effecting broad coverage,'   The words are understood to mean 'originating from,' having its origin in,' 'growing out of' or 'flowing from.'"   Jarvis Christian College v. Nat'l Union Fire Ins. Co., 197 F.3d 742 n.5 (5th Cir. 1999) (quoting Am. States Ins. Co. v. Bailey, 133 F.3d 363, 370 (5th Cir. 1998)).   Using this definition, the pollution exclusion applies to claims that "bear only an incidental relationship to the described conduct."   Nutmeg Ins. Co. v. Clear Lake City Water Auth., 229 F. Supp. 2d 668, 693 (S.D. Tex. 2002).   The Shaws' injuries arose out of the migration of carbon monoxide, a pollutant, from the parking garage to their room, on account of improperly maintained systems, and the failure to utilize appropriate detection equipment.   Thus, the pollution exclusion applies, even if the

other failures identified by the Shaws contributed to their injuries.

The Shaws allege that Liberty Mutual had actual or constructive knowledge of the daily existence of carbon monoxide in the ambient air at the Hotel, and of the failed Hotel systems.   They claim that despite this knowledge, Liberty Mutual continued to issue the Policy and has therefore, waived its right to contest coverage.   There are no facts in the record to prove these allegations, and the Shaws have not cited any legal authority supporting this argument.   Under Texas law: "Waiver and estoppel may operate to avoid a forfeiture of a policy, but they have consistently been denied operative force to change, re-write and enlarge the risks covered by a policy.   In other words, waiver and estoppel cannot create a new and different contract with respect to risks covered by the policy." Ulico Cas. Co. v. Allied Pilots Ass'n, 262 S.W.3d 773, 780 (Tex. 2008).   The Shaws unsubstantiated, conclusory allegations do not alter the plain language of the Policy.

The Shaws claim there is coverage based on the doctrine of regulatory estoppel, which has been employed by New Jersey courts when confronted with a pollution exclusion like the one in the Policy.   See Carter-Wallace, Inc. v. Admiral Ins. Co., 712 A.2d 1116 (1998); Bd. of Educ. of Twp. of Union v. New Jersey Sch. Boards Ass'n Ins. Grp., 315 N.J. Super. 586, 590, 719 A.2d 645, 647 (App. Div. 1998).   This argument assumes that before Liberty Mutual was permitted to transact business and issue policies, it had to obtain approval from some unidentified state, and state body that regulates insurance companies.   They explain that this unidentified body oversees insurance companies in the interest of policyholders to ensure their fair treatment and protect their reasonable expectations.   The Shaws argue that when an insurance company represents to a regulatory board that a policy provision will operate a certain way, the regulatory board will stop the insurance company from denying coverage in

- 11 -

ways inconsistent with the regulatory filing.   They allege, without proof, that unidentified regulatory bodies permitted the addition of the pollution exclusion by Liberty Mutual to deter intentional polluting conduct and reduce premiums.   Then they claim, again without evidence, that Liberty Mutual has not been faithful to the interpretation of the pollution exclusion as represented to the regulatory authorities.   Based on these allegations, assumptions, and speculation, the Shaws conclude that the Court may estop Liberty Mutual from denying coverage.   In SnyderGeneral Corp., 928 F. Supp. at 682 (collecting cases), the court noted that with the exception of New Jersey, "[t]he regulatory estoppel argument has been rejected by virtually every other state and federal court to address the issue."   The court in SnyderGeneral said that although the issue has not been addressed in Texas, in Nat'l Union, 907 S.W.2d at 521-22, the Texas Supreme Court "flatly rejected any attempt to rely on extrinsic evidence to create a latent ambiguity where the policy provision is clear on its face."   On this basis, the SnyderGeneral court opined that the CBI decision "indicates that Texas courts would not be receptive to the regulatory estoppel argument."   SnyderGeneral Corp., 928 F. Supp. at 682.   The Shaws' regulatory estoppel argument fails because there is no evidence to support it, and it is contrary to the greater weight of the applicable legal authorities.

      In their memorandum, the Shaws note that the duty to defend is broader than the duty to indemnify.   While true, this is not a reason to deny Liberty Mutual's motion for summary judgment.   The Shaws also argue, without any legal authority, that because they were business invitees and paying overnight guests of the Hotel, a different (unstated) standard of care applies to them.   Prism's liability to the Shaws has already been established, and the Court fails to see what standard of care has to do with the construction of the pollution exclusion.

Lastly, the Shaws argue that there is coverage because the Policy did not follow form the Federal policy, which was not appropriate given the reasonable expectations of Prism.   An excess policy "follows form" to an underlying primary policy when it covers all the same risks as the underlying policy.   Mesa Operating Co. v. California Union Ins. Co., 986 S.W.2d 749, n. 3 (Tex. App.-Dallas 1999).   "Although it is generally true that umbrella policies are designed to provide excess coverage for risks covered in the underlying policy, we cannot conclude that an umbrella policy covers the same risks under the same terms as the underlying policy unless the umbrella policy clearly and explicitly states that it does so."   Id.   The Shaws' argument is without merit because they have not demonstrated that the Policy includes a statement that it covers the same risks as the Federal policy.   Their argument also fails because "Texas law does not recognize coverage because of 'reasonable expectation' of the insured."   Nautilus, 566 F.3d at 455 (quoting Constitution State Ins. Co. v. Iso-Tex, Inc., 61 F.3d 405, 410 n. 4 (5th Cir. 1995)). And, even if Prism's expectations could be used to establish coverage under Texas law, there is no evidence in the record showing what Prism's reasonable expectations were.

### VI. Conclusion

For these reasons, Liberty Mutual's motion for summary judgment is **GRANTED**. The Clerk is directed to **ENTER** judgment in favor of Liberty Mutual, **TERMINATE** any pending motions, and **CLOSE** the file.

**DONE** and **ORDERED** in Orlando, Florida on February 12, 2016.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to Counsel of Record

- 13 -